[No. 3304. April 3, 1928. Rehearing Denied
Sept. 21, 1928.]

STATE ex rel. DOW, Atty. Gen., et al. v. GRAHAM,
State Treasurer, et al.

[270 Pac. 897.]

R. C. Dow, Atty. Gen., Joseph Hodges, of Silver City, and Sam G. Bratton, of Albuquerque, for appellants.

W. B. Walton, Dist. Atty., of Silver City, Fred Nicholas, Dist. Atty., of Magdalena, R. P. Barnes, of Albuquerque, and C. J. Roberts, of Santa Fe, for appellees.

OPINION OF THE COURT

WATSON, J.   Chapter 185, Laws 1927, is entitled:

"An act creating the county of Rio Grande, and providing for the government thereof, and the payment of its indebtedness, and abolishing the county of Catron, and changing the north boundary line of the county of Grant, and providing for the ascertainment and payment of the indebtedness of said county of Catron."

By section 1 the existing county of Catron is abolished. By section 2 the county of Rio Grande is created and its boundaries defined so as to include all of the existing county of Socorro and a part of Catron.   By section 7 the north boundary line of Grant county is so changed as to include the remainder of Catron county.   The act is made effective June 30, 1928, upon which date Catron county would pass out of existence, and all of its records, moneys, assets, and property would be delivered to the persons entitled to receive them on the part of Rio Grande and Grant counties.   Without going into the minutia of the act, it is here sufficient to add that the property of Catron county is to be distributed and its indebtedness to be apportioned between Grant and Rio Grande counties. To facilitate such distribution and apportionment certain duties are imposed upon the state tax commission and upon the state board of finance.

Claiming, on various grounds, that chapter 185 is in violation of the state Constitution and entirely void, the present suit was instituted by the state, on the relation of the Attorney General, by the board of county commissioners of Catron county, and by the several county officers of that county against the state board of finance, the state tax commission, the board of county commissioners of Socorro county, the individuals comprising said board, the board of county commissioners of Grant county, the individuals comprising said board, and the several county officials of said two counties, to enjoin performance of

the several duties imposed upon them by said chapter 185. All defendants joined in a demurrer upon some forty grounds, and the board of county commissioners of Socorro county and its county officers demurred separately on seven grounds. Both demurrers were generally sustained. Final judgment followed dismissing the complaint, without prejudice to the institution of further proceedings.

If any ground of demurrer is well taken, the judgment is to be upheld. Yet it is impracticable to examine and pass upon them separately. We shall consider only the propositions here advanced to sustain the judgment. We shall find therein, of course, all that appellees' able counsel now have to urge against the complaint, and shall find, no doubt, the theory upon which the trial court reached his decision.

The first proposition submitted is thus stated:

"Injunction is not the appropriate remedy to test the legality of the organization of a county, or to prevent its officers from acting upon the ground that it is not properly organized."

The case at bar, in its essentials, is this: Catron county, a body politic and corporate, with power to acquire and own property, to sue and be sued, contesting the constitutionality of the act to terminate its corporate existence and to dispose of its property, seeks injunction against those charged with putting the act into effect. The act will certainly take effect unless found to be unconstitutional and forestalled by injunction. The great public injury to result is obvious. The impossibility of repairing the injury by any remedy after the event is clear. Upon general principles this is a typical case warranting injunction. It is the familiar case of a resort to equity to enjoin proceedings under a void act for the prevention of irreparable injury to property rights, and of a multiplicity of suits.

Yet appellees urge that injunction does not lie. The contention is that the suit is only to test title to office and to determine the validity of the corporate organization of Rio Grande county, and that the sole remedy is quo warranto. We need question but little of what is said by ap-

pelles on this point. It may be freely conceded that quo warranto is the proper remedy for the purposes stated, and that equity will not undertake to deal with those situations. We may grant the correctness of the texts and decisions which appellees cite. The trouble is that they do not touch this case. If appellants were willing to sit by and see the questioned act put into effect, with its attendant irreparably injurious consequences, their only remedy, it may well be urged, would then be quo warranto. But that remedy is not available at this time. One remedy only is possible, and that the one sought. Appellees' contention amounts to this: That equity may not here interfere to prevent irreparable injuries certainly to ensue, but must resign its jurisdiction in favor of a legal remedy, inadequate, incomplete, and not yet mature. This is exactly contrary to the theory of injunction, and no authority is shown for the contention.

Counsel for appellees perhaps sense the difficulty of applying the rule invoked and the authorities cited to the present case. They warn us at the outset of the argument:

"In approaching a consideration of this question, it is to be remembered that * * * the county of Rio Grande * * * is organized by the Legislature itself, and while it is true the act * * * does not take effect until June 30, 1928, nevertheless the county is as completely organized by the Legislature as though the act had the emergency clause. This being true, the appellants seek to question the right of Rio Grande to be a public corporation, and to inquire into its right to exercise corporate franchises in an action in equity which, we think, under all the authorities, cannot be done."

If this be taken as an attempt to close the gap between the cases relied on and the case at bar, we cannot admit its success. It is true that the Legislature has made complete provision for the organization of Rio Grande county, and that no intervening act is required, such as a survey, an enumeration of inhabitants, or an election, upon the result of which the taking effect of the act is made contingent. The transition is certain to take place on June 30, 1928. Yet, in the meantime, the three counties involved continue in the enjoyment of their boundaries, their rights, and their names. We cannot admit that Rio Grande county is at this time as completely organized as

if the act had carried the emergency clause. Counsel themselves later argue, as a fatal defect in the present proceeding, that Rio Grande will not become a competent party litigant until June 30, 1928.

Two Tennessee cases well illustrate the important distinction we seek to make; the one a successful suit in equity to enjoin proposed organization of a county in violation of the constitution; the other an unsuccessful attempt to invoke equity to oust a county of its franchise and corporate rights after organization effected under an alleged unconstitutional act. In the former (Bradley v. Commissioners, 2 Humph. [Tenn.] 428, 37 Am. Dec. 563), the matter was viewed thus:

"But it is said, that the true remedy for this evil, is by writ of quo warranto and not by injunction.

"To this we answer, if the courts have the power to remedy the evil, that remedy, which, under all the circumstances, will be most effectual, is the one which ought to be resorted to, if there is nothing in the mode of administering the law prohibiting it.

"That the writ of quo warranto is the common-law mode of redressing such grievances is admitted, and that it was the only one which could have been used, before the system of chancery jurisprudence was established upon its present broad and substantial basis, is not denied. But that this remedy is inefficient, for the purposes desired, cannot be controverted. The writ of quo warranto is not a prohibitory writ, and before the question arising under it could be determined, much mischief could and would be done by the organization of the county, the thing sought to be prevented, and no subsequent action of the court could, by possibility, place the parties concerned, in their original, uninjured condition. It is this inability of courts of law to operate prospectively, by prohibition, for the prevention of mischief, that has established upon clear and definite grounds, that portion of chancery jurisdiction which rests upon the doctrine of quia timet. It embraces a great variety of interests, which we need not, and do not design to investigate here. It sufficeth for this case, to say, that it always applies, where great and irreparable mischief may be the consequence of illegal action, which the common-law courts, from their mode of proceeding, cannot stay; such we think this one to be. If the establishment of the county be unauthorized, its organization ought to be prohibited, and this, no court but one of chancery can do."

In Ford v. Farmer, 9 Humph. (Tenn.) 152, the latter of the cases above referred to, after approval of the doctrine of the Bradley Case, the distinction is thus clearly expressed:

"This is presenting the question in a very different aspect indeed, and we know of no principle of chancery jurisprudence, upon which the jurisdiction thus invoked can be exercised. The prohibition of an act, and the undoing of it after it has been performed are very different things, and the jurisdiction of a court of chancery can be maintained in many instances for the one, while the person aggrieved is left solely to his remedy at law for the other."

Counsel for appellees consider the Tennessee authority of no force because quo warranto and information in the nature of quo warranto were unknown to the law of that state. The fact was apparently absent from the mind of the court, at least in the Bradley Case, and what was there said was clearly in answer to the contention now under consideration.

Another case cited by apellants is State ex rel. Forsythe v. Judge, 42 La. Ann. 1104, 8 So. 305. After approving the doctrine of the Tennessee decisions, the court said:

"It follows, therefore, that an injunction at some stage of the preliminary proceedings in execution of this act is not merely the appropriate, but the only effective, remedy, open to parties injured thereby. * * * The plain common sense of the matter is that the injunction at the first stage of the proceedings, preventing their initiation, is the most simple, direct and efficacious remedy, and the one most in the interest of all parties concerned, in order that the vexed question may be settled before expense and trouble, which may prove useless, are incurred."

In that case the act claimed to be unconstitutional was provisional upon the result of an enumeration, and to be effective upon proclamation by the Governor after the making and report of the enumeration. The particular act enjoined was the taking of the enumeration, and the enumerators were apparently the only defendants. Counsel for appellees contend that this is a material distinction. We do not appreciate it. In that case, as pointed out by the court, the enumeration in itself was not harmful to the plaintiffs. Its only significance was "as a step in the proceedings provided for the creation of the said parish." That was, in effect, the injurious act which the injunction forestalled. It chances, in the case at bar, that no injurious acts can be performed by the defendants until Rio Grande county shall have come into existence under the terms of the act. How this difference affects the jurisdiction of equity we do not perceive.

In MacDonald v. Rehrer, 22 Fla. 198, cited by appellees, the court took pains to point out that, by the allegations of the bill, the de facto existence of the town was admitted. The resort to equity was too late.

In People ex rel. Kingsland v. Clark, 70 N. Y. 518, cited by appellees, the court found it unnecessary to determine the question here before us.

We are unable to agree with appellees that this is a mere attempt to adjudicate, in advance, whether Rio Grande will become a legally constituted county on June 30, 1928. The creation of Rio Grande and the enlargement of Grant are mere incidents. What concerns Catron county is the attempt to terminate her existence and to dispose of her property. She comes into equity for the protection of her corporate existence and property rights, naming as defendants persons who threaten them. It seems to be a case for equitable cognizance.

Appellees' second point is thus stated:

"Injunction will not lie against the present officers of Socorro county, because as such they are not proper parties defendant and can do no act in the premises until they become county officers of . Rio Grande county."

Chapter 185 provides that the present officers of Socorro county, defendants here, shall on June 30, 1928, become the officers of Rio Grande county. It is contended that until the transition they are without power to do any act injurious to Catron county or her property; that what they threaten and are required to do is not in their capacities as officers of Socorro county, and that, as such, they are not proper defendants; that an attempt is here being made to obtain an adjudication affecting Rio Grande county in a suit in which that county is not a party and is not represented.

In so far as the objection rests upon the lack of present capacity of the Socorro county defendants to work any injury upon Catron county, it is not applicable to Grant county defendants, nor the state board of finance, nor the state tax commission. So far as they are concerned, there is no troublesome change of capacity in prospect. They await only the time prescribed for doing the acts.

The change in capacity of the Socorro county defendants is more theoretical than real. They turn over, as officers of the one county, to themselves, as officers of the other, the paraphernalia of their offices. That, of course, is mere fiction. The only thing that occurs in Socorro county that does not occur in Grant county is a change of name. Assuming that by reason of this change of name Rio Grande county will be a corporate entity distinct from the present Socorro county, it is clear from the act that it is merely as the successor of Socorro county that it comes into existence. If there is any merit in the insistence that Socorro county is not competent to defend litigation which may affect the rights of Rio Grande county, it is based upon a highly technical conception. There is no substantial difference between the Socorro county defendants and the other defendants, and we do not think that the jurisdiction or lack of jurisdiction of equity should rest upon a distinction so narrow.

But even if greater weight were to be given to this technical objection, there is another answer to it which we think conclusive. In disposing of these preliminary procedural and jurisdictional questions, it must be assumed that the act is unconstitutional. The contention on the one side is that a county about to be abolished and to be deprived of its property, and to be otherwise injuriously affected by an unconstitutional act, may resort to equity to restrain those charged with the duty of putting the act into effect. The opposite contention is that, even though the act be utterly void, the present cause of action cannot be maintained and some of the present defendants are improperly impleaded.

Assuming the act to be void, the capacities of the Socorro defendants will not change on June 30. They will remain officers of Socorro county. There will be no new county of Rio Grande. Whatever the Socorro defendants may assume to do under the void act will be official only in so far as they represent Socorro county. What they now threaten to do as affecting the property rights of Catron county can only be accomplished as officers of Socorro county.

This brings us to the constitutional question. Perhaps the most serious objection urged is that chapter 185 is repugnant to Constitution, art. 4, § 24. The directly material provision is:

"The Legislature shall not pass local or special laws * * * changing county lines, except in creating new counties. * * *"

The several purposes sought to be effected by the chapter are clearly indicated by its title:

"An act *creating* the county of *Rio Grande* * * *abolishing* the county of *Catron,* and *changing* the north boundary line of the county of *Grant.* * * *"

The act is admittedly local or special. It obviously changes county lines. Therefore, upon the face of the constitutional limitation, the act is void unless a new county has been created. This suggests the first question, appellants denying and appellees insisting that Rio Grande, as constitued, will be a new county, within the meaning of the Constitution.

The legislative view is not difficult to penetrate. Its problem was to reduce three counties to two, and, in the process, in order to avoid a violation of the Constitution, to create a new county. What it did to Socorro is exactly what it did to Grant, except that it changed the name of Socorro to "Rio Grande." Yet this, in the view of the Legislature, made the difference between creating a county and changing one's lines.

Counsel for appellees do not contend, however, that the change of name has any material bearing. They urge, indeed, that the Legislature has an unlimited discretion to change the names of counties, and that no legal consequences result. The suggestion has been made that such changes by local or special act are included within the prohibition of "changing the name of persons or places." This we need not decide. If the change of name was a competent act, we agree with counsel for appellees that it has no bearing on the question whether a new county has been created.

Counsel for appellees urge that Rio Grande will be a new county "because it is a different county, has different

boundaries, and made of territory not theretofore embraced within the county." The logic is demonstrably unsound. A change of lines necessarily leads to all of the results mentioned. The provision in question contains (1) an absolute prohibition of changing county lines by local or special law, and (2) an exception in case new counties are to be created. If this is a logical and effective provision, there must be some field in which the prohibition may operate, after making allowance for the exception. The prohibition, if not broader than the exception, is a nullity. Hence, it cannot be proved that a new county has been created by showing that county lines have been changed.

The same argument employed to identify Rio Grande as a new county makes Grant a new county on June 30th. It follows, also, that if Grant and Rio Grande have become new counties, all three of the existing counties have been abolished. We have endeavored to consider this legislation on every theory, but have been unable to escape the conclusion that its result is to change county lines, and not to create a new county.

But, it is argued, this is not the ordinary case of changing county lines which the Constitution makers intended to prohibit. The necessity has arisen to abolish an existing county. This is a power which the Legislature possesses, because it is not withheld. Catron having been lawfully abolished, something must be done with its former territory. It was not contemplated that there should be territory within this state not embraced within the limits of some county.

If we were to concede that Catron has been lawfully abolished, we should be greatly impressed with the argument that, of necessity, the boundaries of adjoining counties must be changed to take in the unattached territory. But, has Catron county been lawfully abolished?

It is suggested that Constitution, art. 22, § 12, contemplates and creates a distinction between constitutional and legislative counties. It provides:

" * * * All counties * * * in said territory shall continue with the same names, boundaries and rights until changed in accordance with the Constitution and laws of the state."

From this it is urged that a county like Catron, created by the Legislature since statehood, may be abolished at legislative discretion. Too much significance is attached to this provision. It goes without saying that the names, boundaries, and rights of counties can never be changed except in accordance with the Constitution and laws. The existing counties were all creatures of existing territorial statutes, which, unless repugnant to the Constitution, were continued in force by another familiar provision. It certainly does not mean that, while the boundaries, etc., of constitutional counties may be changed only in accordance with the Constitution and laws, those of future legislative counties may be changed in disregard of Constitution and laws. The provision has apparently slight importance. It serves merely to emphasize that the state was inaugurated with a complete system of county lines, to be changed only pursuant to general laws, except as new counties might be required. We can see in it no basis for a distinction between constitutional and legislative counties, nor any possible bearing on the question here involved.

It is quite true that no clause is to be found in the Constitution in so many words prohibiting the abolishment of a county, either constitutional or legislative. We do find the prohibition of changing county lines. In view of the protection given to county lines, it is not readily to be admitted that what may not be impaired may be obliterated. But, aside from this, it is practically impossible to abolish one county without changing the lines of others. It is urged that the necessity of abolishing counties, from time to time, as they might, under changed conditions, cease to conduce to the public good, is a matter which did not occur to the Constitution makers; and that the prohibition of changing lines does not apply in such a case. If the prohibition were absolute, the suggestion might have force. But it is not absolute. The limitation affects only the power to make such changes by local or special law. By or pursuant to general laws the names, boundaries, and rights of counties may clearly be changed. So we

are compelled to assume that the whole matter was contemplated and the present exigency provided for by the Constitution makers according to their idea of the demands of good government.

In considering this question, we must bear in mind that article 4, § 24, is not primarily concerned with counties or county government, nor with the evils likely to result from changing county lines or abolishing counties. The general subject of the section is local or special legislation. Its general purpose is to avoid the evils lurking therein. Such evils have been guarded against in most if not all state Constitutions. In ours there is a long list of possible subjects of legislation not to be dealt with by local or special act. All of these are proper subjects of legislation; many of them essential to any system of laws. Yet the Constitution makers considered it unwise, because of anticipated abuses, to permit them to be dealt with by local or special legislation. Such objects must be accomplished by general laws. The section ends:

"In every *other* case where a general law can be made applicable, no special law shall be enacted."

This makes it plain that the Constitution makers selected the enumerated subjects of legislation, including changing of county lines (except in creating new counties), as matters to which general laws could be made applicable. In cases not specified, it is left to the Legislature (whether left to the courts we do not consider) to determine whether a general law can be made applicable, so as to exclude the right to enact a local or special law. But in the enumerated cases the Constitution itself has decided the point.

So, it will not do to assume that a necessity has here arisen which the Constitution makers failed to anticipate. The necessity does not arise until Catron county has been abolished. It has not been abolished, because its abolition involves changes in county lines. Such changes can only be accomplished pursuant to the provisions of some general law. Whether a general law can be made applicable is a closed question. The only exception is when new counties are created. We have no authority to add another, viz., when counties are to be abolished.

.So, also, it matters little what evil the Constitution makers feared might follow changing county lines by legislative act. It may have been the evil of gerrymandering. Each of the prohibited matters of local or special legislation may involve evils of its own. The Constitution wards against all the evils common to special legislation. It is contrary to the genius of our law. It matters not that chapter 185 has no political background or effect, or that its purpose is beneficent and wise. It falls within the constitutional inhibition, which is plain and unambiguous. As said in a recent decision:

"What the Legislature intends is to be determined, primarily, by what it says in the act. It is only in cases of ambiguity that resort may be had to construction. Courts cannot read into an act something that is not within the manifest intention of the Legislature, as gathered from the statute itself. To do so would be to legislate, and not to interpret. There is no ambiguity in this statute, and it neither requires nor admits a construction. It is a plain statement, in unequivocable terms, that a highway such as is prohibited by the Constitution has been attempted to be created. The act therefore must be held to be void." De Graftenreid v. Strong, 28 N. M. 91, 206 P. 694.

We need not here go so far as in that case. We need not insist upon a literal interpretation of an unambiguous provision. We must, however, resist what would nullify. If we were to agree that Rio Grande is a new county, arising upon the ashes of two abolished counties, or were to agree that the lines of Grant and Socorro may be changed in order to allow the abolishment of Catron, there is nothing left of the constitutional inhibition. Any change desired might be effected by selecting the proper term to characterize the act. It is strongly urged that we may not question the motive of the Legislature. We do not. Its motive is immaterial. We are called upon merely to adjudge the validity of the result. We assume that the Legislature's interpretation of the Constitution was according to its own judgment. We must interpret it according to ours. We are constrained to hold that chapter 185 is void.

It follows that the judgment is erroneous. It must be reversed. The cause will be remanded, with direction to

overrule the demurrer and to proceed in accordance with the views herein expressed.·

It is so ordered.

BICKLEY, J., concurs..

PARKER, C. J. I am unable to concur in the result reached by the majority. The rights sought to be asserted by appellants, the county of Catron as such, .the county officers of the county, and the state, are purely political rights, and no civil property rights are involved. In such case equity has no jurisdiction. For this reason I dissent.

## ON MOTION FOR REHEARING

WATSON, J. The argument on this motion is directed to the single point that "the court of equity had no jurisdiction to entertain this cause of action." It is presented under three propositions, namely:

"A. A county is an involuntary political or civil division of the state, subject at all times to control by the Legislature, owning no property in a private or proprietary capacity.

"B. Courts will not interfere by injunction with the exercise of legislative or political functions.

"C. Quo warranto is the exclusive remedy to test the legality of the organization of Rio Grande county."

We cannot admit the correctness of proposition A, as stated. Counties are, no doubt, in general, subject to legislative control. But such control is in turn subject to constitutional limitation. The authorities cited by appellees do not question this. In New Mexico, the Legislature may not, by local or special law, regulate county affairs, locate or change county seats, or change county lines except in creating new counties. Const. art. 4, § 24.

It will not do, therefore, to say that counties are completely subject to legislative control.

Proposition B is evidently taken from Frantz v. Autry, 18 Okl. 561, 91 P. 193. It is found in the opinion by Haines, J. The Oklahoma Territorial Supreme Court was divided, and several elaborate opinions were filed. We find nothing in the case, nor in the authorities there

cited, which seems to us to conflict with what we have held. Whether the abolishing of a county and the disposition of its property is a purely political question under the control of the Legislature, and not a matter of judicial cognizance, depends, as does the former proposition, upon the Constitution. Since we find that these matters have not been left to legislative regulation by local or special law, the property rights here involved would not seem to be mere political rights, but rather to be legal rights which the courts are bound to recognize.

Proposition C was presented originally and disposed of. We decided merely that a remedy by quo warranto to accrue only in the future did not bar jurisdiction in equity. To bring the case within the rule of Tularosa Ditch Case, 16 N. M. 750, 120 P. 301, and State ex rel. Northwestern Colonization & Improvement Co. of Chihuahua v. Huller, 23 N. M. 306, 168 P. 528, 1 A. L. R. 170, appellees urged that, since the Legislature had made complete provision, and nothing but the lapse of time was to intervene, Rio Grande county was to be treated as though it were already in possession of its rights as a county and in possession of the property and territory in dispute. We considered that it was rather to be deemed, for the purposes of the argument, as a county in process of formation. The Tennessee cases were cited as illustrative of the distinction between prohibiting and undoing acts—the former the function of injunction. A more recent illustration is found in Oklahoma jurisprudence. It is stated thus in Specht v. Joint School Dist., 97 Okl. 202, 223 P. 386:

"If the action was for the purpose of determining the question of the validity of an existing organization, then quo warranto was the proper remedy. * * * If the action was to prevent the superintendent of public instruction from doing some illegal act in furthering the organization of the consolidated district, then injunction was the proper remedy."

In that case, finding that the consolidated district was still in process of creation, injunction was held to lie. In Shore v. Board of Education, 97 Okl. 273, 223 P. 867, the action was to enjoin issuance of bonds on the ground that the district had not been legally organized, and, since it was actually functioning under color of law, it was held that quo warranto was the sole remedy.

In the case at bar the so-called new county was not functioning, nor was it in possession of the property in question. Certain individuals, however, threatened acts in furtherance of the statute. The very threat is injurious and unsettling. The situation can be relieved only by a prompt decision of the only legal question involved, the constitutionality of the statute. The public interest and convenience are properly to be considered in determining whether equity should assume jurisdiction. Spelling on Injunctions and Other Extraordinary Remedies (2d Ed.) § 620; Jaramillo v. State, 32 N. M. 20, 250 P. 729; Board of Commissioners of Guadalupe County v. Anaya, 31 N. M. 182, 242 P. 335. We do not think that equity can deny the only adequate and immediately available relief.

We find no merit in the motion for rehearing, and it will be denied.

It is so ordered.

BICKLEY, J., concurs.

PARKER, C. J. I dissent.