686 P.2d 958

**STATE of New Mexico,
Plaintiff-Appellee,**

v.

**D.A. McCALL a/k/a D. McCall,
Defendant-Appellant.**

**No. 5922.**

Court of Appeals of New Mexico.

June 30, 1983.

Paul G. Bardacke, Atty. Gen., Marcia E. White, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

Michael E. Vigil, Marchiondo & Berry, P.A., Albuquerque, for defendant-appellant.

## OPINION

WALTERS, Chief Judge.

In a trial to the court, the jury having been waived, defendant was found guilty of three counts of fraud, three counts of securities fraud, three counts of conspiracy to commit fraud, and two counts of solicitation to commit fraud, all contrary to NMSA 1978, § 30–16–6 (Cum.Supp.1982); NMSA 1978, §§ 58–13–39 and –43; NMSA 1978, § 30–28–2 (Cum.Supp.1982); and NMSA 1978, § 30–28–3 (Cum.Supp.1982), respectively. From a judgment and sentence suspending all but six months' imprisonment

and $40,000 in fines on all counts, defendant appeals. This case is the third appeal reaching this court for decision, thus far, in connection with criminal charges that defendants improperly obtained the benefits of low income housing loans under a State program.

FACTS

*State v. Griffin*, 100 N.M. 75, 665 P.2d 1166 (Ct.App.1983), details the background of the low income housing program established in New Mexico through the Mortgage Finance Authority (MFA) legislation, NMSA 1978, §§ 58–18–1 through 58–18–27 (Repl.Pamp.1982). In addition to the facts outlined there, and pertinent to this appeal, are the additional facts that Mortgage Guaranty Insurance Company (MGIC) had a contract with MFA to insure the various loans purchased by MFA from the private lending institutions which participated in the program. MGIC required from the lender, before issuing insurance, a "loan package" which included the loan application, verification of down payment, verification of the applicant's employment and income, and appraisal of the property. MGIC relied upon the lender's approval of the loan application as a guide to its issuance of insurance.

Three properties were involved in the charges on which this defendant was convicted. Defendant's secretary made application for an MFA loan on the first property (which was owned by defendant), falsely representing her income (verified by defendant), her savings, her down payment on the property, and her intention to occupy the property. The house was deeded back to defendant by his secretary approximately three months after the loan was approved and the sale made. In addition to these proofs, the court found that the secretary's sole intention was to receive $1,000 from defendant for obtaining the loan and to aid him in refinancing his property; and that defendant's intention was to have a loan approved that would be insured by MGIC and purchased by MFA, to his benefit, "for the sole purpose of refinancing his ownership interest" in the property.

An application for a loan to purchase the second property was made by an employee of a title company jointly owned by defendant, by the chairman of MFA, and by one other person. That application pertained to another home owned by defendant, but its occupancy and ultimate ownership was to be by one other than the employee-applicant who could not himself qualify for an MFA loan because of his history of erratic income. In the application, the employee falsely represented her income, a down payment on the property, moneys owned by her in her checking account, and her intention to occupy the premises. She was paid $500 from title company funds for making the application; the property was appraised by defendant at a figure that resulted in her receipt of a loan covering 100 percent of the purchase price. MGIC insured the loan and MFA purchased it from the lender, and defendant received the proceeds in payment of the sale of his house.

Defendant's secretary again was the loan applicant in the third transaction, approximately ten months after she had received her first loan. Defendant was convicted of fraud, security fraud, and conspiracy to commit fraud in connection with the third loan upon evidence that the secretary had made a down payment on a house she wanted to buy with funds advanced by defendant, and had signed a purchase agreement to close approximately 30 days later. In her application for the MFA loan, she overstated her income and falsely represented deposits in her savings account as hers when in fact they were defendant's funds. Defendant verified her income to the lending institution. Because the loan had not been fully processed by the date of closing, defendant bought the house from the seller under the same terms as had been agreed upon between the seller and his secretary, and he then agreed to sell the house to his secretary at a price $5,500 higher than she had agreed to pay under her original agreement with the first seller. The secretary ultimately obtained the loan

and defendant received the proceeds as the new seller of the property.

Appellant raises thirteen issues on appeal. We have grouped them and we discuss (I) Grand jury proceedings and pre-trial rulings; (II) Sufficiency of the evidence; and (III) The sentences imposed.

## I.

### A. Publicity

On November 22, 1981, while a grand jury was considering the indictment returned against defendant, an extensive newspaper story appeared in the Albuquerque Journal describing allegations of fraudulent dealings and falsification of records in connection with home loans made by a Santa Fe lending institution. Defendant was prominently named in the article. On November 30th defendant moved that the grand jury be discharged from considering any matter pertaining to him, but an indictment was returned against him on December 4, 1981 before the motion was heard.

However, on December 1st the Assistant Attorney General told the grand jurors:

> There were a couple of things that I think we needed to go ahead and address before we get going. I think that Judge Baca may also want to instruct you in this regard. If anybody read any newspaper accounts dealing with any of the individuals who have been discussed during these proceedings, you are to ignore those newspaper articles and any decision which you render in this proceeding should be based solely and I emphasize solely, on the evidence and testimony that is presented to you during this grand jury proceedings.

Defendant then moved to subpoena the grand jurors to determine whether any of them had knowledge of the publicity and to dismiss the indictment if appropriate. Defendant's motions were denied.

The request for dismissal was based on two grand jury statutes. First, the oath taken by grand jurors speaks of their receipt of "legal evidence" and proscribes indicting "through malice, hatred or ill will." NMSA 1978, § 31–6–6(A)(1) (Cum. Supp.1982). Second, NMSA 1978, § 31–6–11(A) (Cum.Supp.1982), suggests that the grand jury must rest an indictment only upon the evidence submitted to it. As a prelude to his argument, defendant alleges error in the court's failure to require the testimony of grand jurors to establish whether they had read the article and were affected by it.

There is merit to defendant's contentions to the extent that he is entitled to relief if the grand jurors had read the article and it influenced their findings. NMSA 1978, Evid.R. 606(b), allows juror testimony on the subject of extraneous prejudicial information having been injected into the jury's deliberations. *See also* D. Louisell & C. Mueller, Federal Evidence, § 292, at 168 (1979). Defendant may not be penalized for not tendering what the jurors' testimony would have been; grand jurors are bound by an oath of secrecy not to talk to defense counsel. Section 31–6–6(A)(1).

This point of error rests on the presumption of prejudice that arises when certain grand jury statutes are violated. *Davis v. Traub*, 90 N.M. 498, 565 P.2d 1015 (1977) (unauthorized person before grand jury); *Baird v. State*, 90 N.M. 667, 568 P.2d 193 (1977) (prosecutor present during deliberations); *State v. Hill*, 88 N.M. 216, 539 P.2d 236 (Ct.App.1975) (unauthorized person, who was private prosecutor, present before grand jury).

On the question of potentially prejudicial publicity, there is substantial federal authority establishing that it does not go to the heart of the grand jury system, and it is to be expected in so many cases that it will not vitiate an indictment. 8 J. Moore's Federal Practice, ¶ 6.04[9] (1982); D. Louisell & C. Mueller, *supra;* 1 C. Wright, Federal Practice and Procedure, § 102, at 210 (2d ed. 1982). Professor Wright points out that no indictment has ever been dismissed on the claim of bias resulting from massive pre-indictment publicity. *Id. United States v. Mandel*, 415 F.Supp. 1033, 1061–65 (D.Md.1976), ably analyzes the considerations which preponderate to reject

such an attack on the indictment. That analysis was echoed by the trial court below, i.e., that there will almost always be widespread publicity in sensational cases; if dismissal for preindictment publicity were to result, many prominent or notorious persons could avoid the criminal process completely.

The general rule stated in the federal cases is that if lack of bias is a specific requirement of grand jurors, the bare fact of publicity does not show bias. *Estes v. United States*, 335 F.2d 609 (5th Cir.1964), *cert. denied*, 379 U.S. 964, 85 S.Ct. 656, 13 L.Ed.2d 559 (1965). Publicity may only result in dismissal if it is generated by the government toward the end of unfairly biasing the grand jurors. *United States v. Mandel, supra.* There is no allegation and no evidence that the article about which complaint is made in this case was so induced.

■ The grand jury statutes cited by defendant, as we have said, prescribe legal evidence and proscribe malice. The New Mexico Supreme Court has approved an explanatory instruction for use in grand jury proceedings. NMSA 1978, UJI Crim. 60.00 (Repl.Pamp.1982). The instruction recognizes the possibility that grand jurors will read or hear things about the case; it instructs the jury to decide the case solely on the evidence. The prosecutor cautioned the jury to that effect. We are unable to hold that the trial court erred in not questioning the grand jurors and in not dismissing the indictment. *See Buzbee v. Donnelly*, 96 N.M. 692, 706, 634 P.2d 1244, 1258 (1981).

**B. Prosecutor Misconduct**

Defendant asserts error in the trial court's denial of his motion to dismiss the indictment for prosecutor misconduct before the grand jury. This claim is predicated on a statement of the prosecutor to the grand jurors that he was requesting an indictment on those crimes which he, as their legal advisor, felt had been committed. His comment occurred near the end of the presentment and again after the jury

was instructed. The prosecutor, however, corrected himself and said that these were the crimes "that the evidence seems to reflect." He told the jurors several times that it was their decision to determine whether there was probable cause to indict, and that such a decision was solely within their province.

This case is not similar to *State v. Good*, 10 Ariz.App. 556, 460 P.2d 662 (1969), relied upon by the defendant. In *Good*, the prosecutor repeatedly exhorted the grand jury to indict. In our view, this case is more like *State v. Ballinger*, 99 N.M. 707, 663 P.2d 366 (Ct.App.1983) (opinion on remand filed March 15, 1983), where the grand jury heard a mass of evidence, and the prosecutor's comment was inadvertent rather than deliberate.

■ The prosecutor is to instruct the jury on applicable charges. NMSA 1978, UJI Crim. 60.10 (Repl.Pamp.1982). In explaining to the jurors the purpose of the instructions, the prosecutor lapsed into prohibited comment on what charges he felt the jury should return. But because his remarks were corrected and tempered with repeated instructions to "decide the case for yourselves on the evidence," it was not misconduct of a nature requiring dismissal of the indictment. *State v. Ballinger, supra; State v. Martinez*, 97 N.M. 585, 642 P.2d 188 (Ct.App.1982); *State v. Saiz*, 92 N.M. 776, 595 P.2d 414 (Ct.App.1979).

**C. Subpoena of Bank Records**

The State, and perhaps the grand jury (we did not search the record), issued a subpoena to defendant's banks for production of defendant's bank records, and the banks complied. Defendant moved to quash the subpoena(s) and, alternatively, to suppress all materials obtained by such subpoena(s). The motions were denied.

NMSA 1978, § 14–7–1 provides:

**14–7–1 Requiring notice of intent to gain access to records of financial institutions.**

A. At least seven days prior to a state agency, board or commission requesting

or gaining access to or copies of the records of a person, corporation, company or organization, maintained by a bank, savings and loan association, small loan company or other similar financial institution, the agency, board or commission shall notify by certified or registered mail, the person, corporation, company or other organization of its intent to gain access or acquire such records.

B. The requirement of notice set forth in Subsection A of this section shall not apply to the audit of any bank, savings and loan association, small loan company or other similar financial institution by a state agency, when conducted pursuant to the agency's statutory directive.

C. The provisions of Subsection A of this section shall not apply to requests for records made pursuant to an administrative subpoena. In such instances at least twenty-four hours' notice shall be given to the person, corporation, company or organization.

Defendant was not given the statutory notice.

The United States Supreme Court, in *United States v. Miller*, 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976), held that bank records, including checks, deposit slips, financial statements, and monthly statements, are not within any zone of privacy protected by the Fourth Amendment. They were decided, in *Miller*, to be items of information voluntarily conveyed by the depositor to the banks, and thus information exposed to all of the banks' employees in the ordinary course of business without any anticipation of privacy.

The *Miller* decision has been vehemently criticized by at least one eminent authority. 1 W. LaFave, Search and Seizure, § 2.7(c) (1978). LaFave stamps the result "dead wrong" and the reasoning "woefully inadequate." *Id.* at p. 411. Professor LaFave contends that the Supreme Court ignored modern realities of life and based its decision on notions of property long since rejected in Fourth Amendment analyses. He points out, citing respectable precedent, that banks are a necessity in the transac-

tions of daily life and that people do not, by their use, knowingly expose or surrender their personal histories to public scrutiny. Rather, they disclose information in their checks to their banks for the sole purpose of debiting, crediting, or balancing their accounts. Moreover, banks recognize their role as the agent of their depositors and they keep customer transactions private. The bank has virtually no occasion to reconstruct a customer's life, or any interest in doing so, by its cursory viewing of underlying transactional information in its customers' accounts. To give the government the right to do that, says LaFave, is "pernicious." *Id.* at 417. *See* cases therein cited.

Some state courts have similarly analyzed searches of personal records and declared that state constitutional law imposes a privacy interest in bank and business records. *E.g., Burrows v. Superior Court of San Bernardino County*, 13 Cal.3d 238, 118 Cal.Rptr. 166, 529 P.2d 590 (1974) (bank records); *People v. Blair*, 25 Cal.3d 640, 159 Cal.Rptr. 818, 602 P.2d 738 (1979) (credit card and telephone call records); *Charnes v. DiGiacomo*, 200 Colo. 94, 612 P.2d 1117 (1980) (bank records). In *Commonwealth v. DeJohn*, 486 Pa. 32, 403 A.2d 1283 (1979), *cert. denied,* 444 U.S. 1032, 100 S.Ct. 704, 62 L.Ed.2d 668 (1980), the Pennsylvania Supreme Court called the *Miller* decision "a dangerous precedent, with great potential for abuse," and held that the Pennsylvania Constitution protected against such unreasonable searches and seizures absent valid legal process. In *DiGiacomo, supra,* a subpoena for bank records was upheld, but it is significant that the statute there authorizing administrative subpoenas required the agency to make a showing satisfactory to a district court judge that the court should cause the subpoena to issue. Statutes may enlarge constitutional rights, *State v. Wilson,* 92 N.M. 54, 582 P.2d 826 (Ct.App.1978), but they may not impinge upon, conflict with, or reduce constitutional protections. *See State ex rel. Dow v. Graham,* 33 N.M. 504, 270 P. 897 (1928).

It is not necessary for us to decide at this time whether New Mexico would interpret the statute authorizing the administrative subpoena according to *Miller*, or otherwise under our state constitution as California, Colorado and Pennsylvania courts have done, or whether a grand jury subpoena falls under the requirements of § 14–7–1. Defendant has not cited us to any portion of the record supporting his claim that the grand jury subpoenaed his bank records. There is testimony by defendant at a pretrial hearing that some of defendant's business documents were referred to in the grand jury transcripts that he had read, and that loan officers of two banks had told him they had responded to a grand jury subpoena. But we are not told where that evidence is in the record before us; we do not know what the evidence consists of that he complains about; we are not advised whether exhibit documents were those so obtained, or in what manner, if any, they prejudiced defendant. *Cf. State v. Martin*, 90 N.M. 524, 565 P.2d 1041 (Ct.App.1977).

Nor need we consider whether the failure in this case to give defendant notice, as required by the statute, would require suppression of the fruits of the State's subpoena issued for trial. The trial judge effectively suppressed the records, ruling that any evidence obtained by the subpoena, other than defendant's financial statement which had previously been introduced by defendant at an earlier hearing, could not be examined by the State until both defendant and the trial court had been alerted and, tacitly, an examination authorized.

Additionally, with 144 packets of compound exhibits offered by the State and only an abstract contention that defendant's privacy interest was invaded, without specific citation to the tapes, the kinds of records obtained, or the prejudice resulting to defendant, we would engage in impermissible speculation to decide the privacy issue attaching to either the grand jury or trial stage of the proceedings below. *See Perez v. Gallegos*, 87 N.M. 161, 530 P.2d

1155 (1974). Appellate courts do not render advisory opinions. *State v. Herrod*, 84 N.M. 418, 504 P.2d 26 (Ct.App.1972).

## D. Notice of the Charges

In two separate points defendant urges that the trial court improperly denied his motions for a statement of facts and to compel the State to elect the precise theory of culpability upon which the charges would be tried. The several counts of the indictment alleged crimes committed by various alternative means and against various alternative persons or entities. Defendant complains that the manner of charging in Count I, for example, exposed him to defending against a potential of 12 separate means of committing the crime alleged; in Count II, for example, against 56 possible methods of committing securities fraud.

The exponential variations in the multiple counts resulting from the alternative and cumulative form of charging throughout the indictment indeed exposed defendant to a broad field of allegedly illegal conduct. New Mexico's appellate courts, however, have held that access by the defendant to the grand jury proceedings, and maintenance by the prosecutor of an "open file" policy for defendant's examination, obviates the requirement to furnish a statement of facts sufficient to allow defendant to prepare his defense, *State v. Hicks*, 89 N.M. 568, 555 P.2d 689 (1976), and its progeny; *see State v. Sheets*, 94 N.M. 356, 610 P.2d 760 (Ct.App.1980). We have no authority to change that rule. *Alexander v. Delgado*, 84 N.M. 717, 507 P.2d 778 (1973).

Regarding the request for election, *State v. Gurule*, 90 N.M. 87, 559 P.2d 1214 (Ct.App.1977), and *State v. Ortiz*, 90 N.M. 319, 563 P.2d 113 (Ct.App.1977), instruct that it is not unfair and there is no deficiency in notice to the defendant when one offense is charged but multiple ways in which the offense could have been committed are alternatively alleged, and the State's file is open for inspection by defend-

ant. *Cf. State v. Coulter*, 84 N.M. 647, 506 P.2d 804 (Ct.App.1973). The implication is inescapable that the State is not required to elect its precise theory of defendant's unlawful conduct. *Sanchez v. State*, 97 N.M. 445, 640 P.2d 1325 (1982), is not to the contrary. The *Sanchez* indictment attempted to charge defendant alternatively, cumulatively, and vaguely, for the purpose of converting separate crimes into a single offense solely to elevate several misdemeanor crimes to the status of a single third degree felony. Those are not the facts of this case; "stacking" is not an issue.

■ If, as defendant argues, we are unable to review the extent of the State's "open file" because the record before us does not clearly identify or specify the contents of that file, the onus for the deficiency in the record must be borne by defendant. *State v. Duran*, 91 N.M. 756, 581 P.2d 19 (1978). We are not told, however, that any evidence produced by the State at trial came as a surprise to defendant or was withheld from defendant's knowledge prior to trial. The trial court was careful, at the hearing on defendant's motions, to require a thorough explanation by the State of the charges, the names of witnesses, the names of alleged conspirators, the individuals or entities who relied on representations made, the basis of values alleged, and the State's theory of the security fraud charges. Those requirements should have met the needs stated by defendant's motions. Consequently, we are not persuaded that defendant did not have sufficient notice and information to adequately prepare his defenses to the charges of the indictment.

**E. Severance**

Defendant asked the trial court for severances that would permit separate trials on each transaction alleged in the indictment, contending that the evidence produced on each offense charged, multiplied by the number of similar charges relating to five separate mortgage transactions, would create massive prejudice to defendant and severely tax the fact-finder's impartiality.

■ Joinder of the offenses in the indictment is authorized by NMSA 1978, R.Crim.P. 10 (Repl.Pamp.1980). Severance of the counts for trial is a matter of discretion for the trial court, *State v. McGill*, 89 N.M. 631, 556 P.2d 39 (Ct.App.1976); NMSA 1978, R.Crim.P. 34 (Repl.Pamp. 1980); but that discretion must be exercised diligently to assure that prejudice does not prevail because of evidence heard on one count that would be inadmissible on another, or because the number of charged offenses alone would impart an aura of guilt. *Cf. State v. Paschall*, 74 N.M. 750, 398 P.2d 439 (1965).

■ The danger, however, of improperly influencing the fact-finder by these circumstances is not present in this case. The denial of a severance occurred after defendant had waived a jury and agreed to trial by the court. The trial court is presumed to have disregarded incompetent evidence, *Matter of Doe*, 89 N.M. 700, 556 P.2d 1176 (Ct.App.1976); defendant's acquittal on 10 counts of the indictment dispels any notion that the number of offenses charged disturbed the impartiality of the trial judge. *See State v. Sero*, 82 N.M. 17, 474 P.2d 503 (Ct.App.1970).

**II.**

**A. Evidence of Fraud**

NMSA 1978, UJI Crim. 16.30 (Repl. Pamp.1982), sets forth the essential elements of fraud to be:

1. The defendant, by any words or conduct, [made a promise he had no intention of keeping] [misrepresented a fact] to [name of victim] intending to deceive or cheat [name of victim];

2. Because of the [promise] [misrepresentation] and [name of victim]'s reliance on it, defendant obtained [describe property or state amount of money];

3. This [property] belonged to someone other than the defendant; and

[4. The [property] had a market value of over $_____];

5. This happened in New Mexico on or about the _____ day of _____, 19__

Defendant claims that without a victim, there can be no fraud; and because of the way the MFA program operated, none of the alternative "victims" listed in the indictment were damaged. That is, the lenders suffered no damage because MFA bought the loans; MGIC was not damaged because it was paid premiums for insurance issued; MFA was not injured because its money went to the lending institutions, not defendant, and it receives repayment from the borrowers.

■ In *State v. Griffin, supra,* we held that "victim" in the context of New Mexico's restitution statute, NMSA 1978, § 31–17–1 (Repl.Pamp.1981), could be a human being or a legal entity, but restitution could be ordered only when the victim has suffered actual damage as a result of a defendant's criminal activity. But the requirement of actual damage to the victim is not an element of fraud; indeed, the instruction does not identify whose property defendant must obtain as a result of his fraudulent conduct in order that he be guilty of the crime. Many criminal offenses do not require that another be victimized, e.g., possession of controlled substances, switchblades, explosives; prostitution, and so forth.

The trial court made 78 separate findings of fact, many of those findings having several sub-parts. It appears from the findings regarding fraud that defendant's convictions on those counts were predicated upon his accessory status, incident to the initiatory misrepresentations by his secretary and other employee in the three transactions first described in this opinion, and defendant's willing and active participation in the misrepresentations made by those employee-applicants to the lending institutions. If convicted as an accessory, that was not improper. *See* NMSA 1978, § 30–1–13; *State v. Wall,* 94 N.M. 169, 608 P.2d 145 (1980).

■ It is undisputed that defendant's employees were ineligible for MFA loans under the MFA standards, guidelines and regulations. It is not significant that the MFA regulations were not recorded as required by NMSA 1978, § 14–4–5, so as to give them enforceability. There was ample evidence that defendant was one of the ground-floor participants in the MFA program, was a business partner of the chairman of MFA, was a long-time realtor and broker, knew the general credit requirements lenders demanded of home loan borrowers, and was aware that MFA funds were to be used for low income applicants who were creditworthy. The fact that defendant was the owner of all three homes purchased by ineligible applicants with MFA funds—and that those applicants were defendant's employees, as well—and that all three sales redounded to defendant's benefit, is overwhelming evidence that all three transactions resulted from intentional misrepresentations to the lenders, the insurer, and the MFA, to obtain something of value to which neither he nor the applicants were entitled.

The cases cited by defendant for the proposition that because the MFA rules and regulations were invalid, he could not be convicted of fraud by violation of them, are beside the point. This claim, as well as the contention that loan requirements were not uniformly applied, do nothing to excuse defendant's participation in the deliberate, calculated misrepresentations of his employees by which undeserved loans were obtained for his ultimate benefit. The proofs necessary for conviction did not depend upon whether or not MFA's rules and regulations were valid; the court's findings did not even mention them. The misrepresentations constituted the fraudulent acts. *See Bryson v. United States,* 396 U.S. 64, 90 S.Ct. 355, 24 L.Ed.2d 264 (1969). The evidence sustains the fraud convictions.

**B. Evidence of Securities Fraud**

Three reasons are advanced by defendant which challenge the securities fraud convictions, the first resting upon insuffici-

ency of evidence of any fraud. We have disposed of that argument in II A above. The other contentions are (1) that there was no fraud "in connection with an offer, sale or purchase of any security" as prohibited by NMSA 1978, § 58–13–39, and (2) that the crimes prohibited by § 58–13–39 do not apply to the security or the transactions here involved because they are exempted by NMSA 1978, §§ 58–13–29 and –30 (Cum.Supp.1982).

(1) The trial court specifically found that the factual basis for the securities fraud violations were in the transfers from the lenders to MFA of the notes evidencing the loans. Defendant emphasizes that he had no part in those transfers; they occurred because of independent prior agreements between the lenders and MFA that MFA would purchase the securities obtained from the buyers. The critical language is, of course, the meaning of "in connection with," as used in § 58–13–39.

■ New Mexico has not interpreted that phrase. However, its federal counterpart, 15 U.S.C. § 78j, and the federal agency's Rule 10(b)(5), have been construed. T. Parnall and W. Ticer, A Survey of the Securities Act of New Mexico, 2 N.M.L. Rev. 1, 48 (1972), found similarity of wording in the federal and state statutes. The United States Supreme Court has said that "connection" is construed broadly so that if fraud "touches" on the sale of security, the requisite connection exists. *Superintendent of Insurance v. Bankers Life and Casualty Co.*, 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971). *Tully v. Mott Supermarkets, Inc.*, 540 F.2d 187 (3rd Cir.1976), requires that there be a causal connection between the fraud and the sale. In *Annot.*, 3 ALR Fed. 819 (1970), at 824, it is stated that the "in connection with" requirement is met when there is a purchase or sale in reliance on the fraud. Other federal cases to like effect may be found at notes 481 and 521 of 15 U.S.C.A. § 78j. Federal authority on federal statutes similar to state law is persuasive in New Mexico. *State v. Weddle*, 77 N.M. 420, 423 P.2d 611 (1967).

■ As to the sale of each note, the trial court found that MFA bought the note "because of" the misrepresentations made by defendant and his employee. The evidence recited by defendant in his summary of proceedings supports those findings and no claim to the contrary is made.

A case where the alleged fraud was substantially distant from the eventual sale of securities is *Sharp v. Coopers & Lybrand*, 457 F.Supp. 879 (E.D.Pa.1978), *aff'd*, 649 F.2d 175 (3rd Cir.1981), *cert. denied*, 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1982). At issue was an accountant's opinion letter on tax liability, which letter was later used to induce others to invest in the venture to which the opinion related. The court there said that the "in connection with" requirement was limited to the extent that the defendant must reasonably foresee that his fraud would be used in connection with purchase or sale of a security.

Even under the *Sharp* test, however, the findings of the trial court satisfy the limitation of foreseeability. Regarding the sale of the notes, the trial court found that the misrepresentations were made with knowledge by defendant that MFA would buy the notes. The evidence sustains those findings. Defendant testified that he was familiar with the MFA program, even to the extent of going to New York to attend one of its bond closings; that as a developer, he obtained commitments from lenders of MFA funds; that he knew all of the personnel at MFA and knew it was necessary for applicants to qualify for MFA loans, and he knew that creditworthiness was a crucial consideration in granting MFA loans. He was also aware that buyers would be required to sign notes as security for their loans.

Defendant's intentional course of conduct fell within the meaning of "in connection with" the sale of a security, as that meaning has been judicially defined.

(2) Defendant contends that § 58–13–29 exempts from prosecution actions involving securities "issued or guaranteed by . . . any

state or political subdivision of a state ...." and "any security issued by and representing an interest in, or a debt of or guaranteed by ... any insurance company"; and that § 58–13–30 removes the provisions of §§ 58–13–4 through 58–13–28 of the Securities Act from "any transaction ... secured by a real ... mortgage or deed of trust, or by any agreement for the sale of real estate ... if the entire mortgage ... together with all the bonds or other evidence of indebtedness secured thereby is offered and sold as a unit."

Section 58–13–29 states that the provisions of §§ 58–13–4, –5, –7 and –8, relating to registration of securities, and registration by notification, coordination or qualification, do not apply to the type of securities identified in the first quotation above taken from § 58–13–29. That section provides only, insofar as the instant case is concerned, that the kinds of securities attaching to the transactions with which defendant was charged were not securities that had to be registered.

Section 58–13–30 then exempts the provisions of §§ 58–13–4 through –28 from the kind of transactions secondly described in the above quotations from the exempting statutes. Sections 58–13–4 through –28 refer to registration requirements and to procedures for registering securities, salesmen, dealers, advisors, etc., and to fees to be assessed for the various registrations.

Section 58–13–39, proscribing fraudulent practices, and § 58–13–43, setting the penalties for fraud, say nothing about their provisions being applicable only to fraudulent dealing in *registered* securities or against *registered* dealers or brokers.

■ Defendant's argument is that § 58–13–44 refers to "any action, civil or criminal, where a defense is based upon any exemption provided for in the Securities Act." Thus, he says, the exemption sections apply to *any* action, including this prosecution. But § 58–13–44 simply requires that one who claims an exemption as a defense must prove the existence of the exemption. If we were to agree that defendant proved the transactions were ex-

empt from the provisions of §§ 58–13–4 through –28, and that the securities were exempt from registration, what *defense* dependent upon those exemptions is raised?

We are urged to read *Bills v. All-Western Bowling Corp.*, 74 N.M. 430, 394 P.2d 274 (1964), as holding that an action for violation of the Securities Act may not be maintained if an allegedly fraudulent sale pertained to securities that were not required to be registered. That is much too narrow a reading of that case. *Bills* was a civil suit; plaintiffs sought to recover their purchase price, alleging that the sale had been fraudulently induced and had been made in violation of the Act. The supreme court did no more than agree with the trial court that the securities did not have to be registered under the Act then in effect— they were exempt—but, more particularly, that plaintiffs had failed to prove fraudulent inducement.

■ The fact that the securities are exempt from registration laws has never, to our knowledge, been a defense to charges of fraud. *See* I L. Loss, Securities Regulation, ch. 3D at 710 (2d ed. 1961), and its supplement, n. 7 at 2677 (1969); T. Parnell & W. Ticer, *supra*, at 16. We read § 58–13–43 to include offenses proscribed by § 58–13–39.

The exempt status of the securities and the transactions does not create an exemption from prosecution for securities fraud.

## C. Solicitation and Conspiracy

Defendant's claim that failure to prove the underlying elements of the crimes of fraud and securities fraud vitiates the crimes of solicitation and conspiracy to commit those crimes has been answered adversely to his contention. He urges further, however, that § 30–28–3D precludes findings of guilt on charges of both solicitation and conspiracy. That subsection reads:

D. A person is not liable for criminal solicitation when his solicitation constitutes conduct of a kind that is necessarily incidental to the commission of the

offense solicited. When the solicitation constitutes a felony offense other than criminal solicitation, which is related to but separate from the offense solicited, the defendant is guilty of such related felony offense and not of criminal solicitation. Provided, a defendant may be prosecuted for and convicted of both the criminal solicitation as well as any other crime or crimes committed by the defendant or his accomplices or coconspirators, or the crime or crimes committed by the person solicited.

This above portion of the statute appears designed to handle the theory of merger. *See State v. Sandoval,* 90 N.M. 260, 561 P.2d 1353 (Ct.App.1977).

The first sentence provides for no liability when the solicitation is necessarily incidental to the principal offense solicited. Thus, if the theory of guilt of the principal offense is that of accessory liability for fraud or conspiracy to commit fraud, solicitation would be necessarily incidental to it and there could be no liability for solicitation.

■ The second sentence provides that a person is "not guilty" of solicitation when the solicitation constitutes a felony offense other than criminal solicitation. Consequently, if the solicitation constitutes conspiracy, defendant would be guilty of the conspiracy and not of the solicitation.

The third sentence provides that a person may be prosecuted for and convicted of all offenses in the situations covered by the first two sentences. What this must mean is that the prosecution need not make a pretrial or preinstruction election; rather, all offenses may be submitted to the jury. The "no liability" or "not guilty" determinations contained in the first two sentences would only be made at the time of entering the judgment and sentence. One could not be separately sentenced for two offenses if his case fit within the first two sentences of § 30–28–3D. *See State v. Gallegos,* 92 N.M. 370, 588 P.2d 1045 (Ct.App.1978).

There remains the question whether there could be adjudications of guilt when the offenses charged fall within the first

two sentences. *See Gallegos, supra; see also State v. Keener,* 97 N.M. 295, 639 P.2d 582 (Ct.App.1981). The first two sentences of subsection D provide that there cannot be; the third sentence indicates that a defendant can be adjudicated guilty if "convicted" is defined as it was in *Keener, supra.* But *Keener* arrived at its holding by an interpretation of the Rules of Evidence. Although such an interpretation is not required here, we do not see any barrier to a formal adjudication of guilt on both counts so long as there is no separate sentence on each count. A possible collateral consequence, *see Gallegos, supra,* in terms of habitual liability if defendant later commits a crime, is avoided by the express terms of NMSA 1978, § 31–18–17 (Repl. Pamp.1981), since the solicitation convictions here are part of the same transactions related to the, other convictions.

■ Nonetheless, defendant is entitled to relief under § 30–28–3D, *supra.* He was adjudicated guilty on two counts of solicitation to commit fraud; at the same time, he was adjudicated guilty on the fraud and conspiracy to commit fraud counts. We conclude, from the court's findings, that defendant was found guilty of fraud as an accomplice. As a guilty accomplice, the first sentence of § 30–28–3D provides that he is not liable. Because the solicitation also constituted a conspiracy, defendant was guilty of conspiracy and not of solicitation under the second sentence of the same subsection.

### III.

**A. Sentences of Solicitation and Conspiracy**

■ From what we have said in II D, the solicitation sentences must be vacated. The court ordered concurrent prison sentences on all convictions, but imposed a total of the fines on all convictions of $70,000 and suspended a portion of that total. Defendant, however, is liable for payment of all of the $70,000 should he breach the conditions of suspension. That condition, as it applies to the total of the fines as-

sessed, is not consistent with the provisions of § 30–28–3D. Accordingly, the fines attaching to the solicitation convictions must also be vacated.

### B. Sentences for Fraud and Securities Fraud

With regard to the convictions of fraud and security fraud, a similar adjustment in the sentences and fines imposed must be made. We held on June 7, 1983, in *State v. Maes,* 100 N.M. 78, 665 P.2d 1169 (Ct.App. 1983), that one convicted of aggravated assault and robbery could be punished for only one crime because the offenses merged.

It was said, in *State v. Quintana,* 69 N.M. 51, 364 P.2d 120 (1961), an early case discussing merger, that "if the several offenses are the same, as where they arise out of the same transaction, and were committed at the same time, and were part of a continuous criminal act, and inspired by the same criminal intent, which is an essential element of each offense, they are susceptible of only one punishment." 69 N.M. at 57, 364 P.2d 120. "Same transaction" has since been disapproved as one of the tests of merger, *State v. Tanton,* 88 N.M. 333, 540 P.2d 813 (1975), but the remaining guidelines of *Quintana, supra,* have not been discredited, and have been focused to emphasize the "same evidence" test in proving each offense. *See State v. Tanton, supra.*

It is manifest, from the language of the criminal statute defining securities fraud, § 58–13–39A, that it is necessary to prove conduct that would constitute the crime of fraud before one could be found guilty of securities fraud. Securities fraud is statutorily defined by using the very terms "fraud" and "defraud." Even if, as we believe, the trial court based defendant's convictions of fraud on an accessory basis, the underlying "fraud" of the principals was, still, directly or indirectly, "in connection with" an offer, sale, or purchase of those instruments which constituted "securities," as that word was defined in *State v. Sheets,* 94 N.M. 356, 610 P.2d 760 (Ct.App.

1980). The notes given by the applicants created the securities which constituted the underlying basis of defendant's convictions of securities fraud.

Defendant's "accessory" participation at the applicants' stage in each transaction was merely the opening gambit in the completed criminal acts of securities fraud. *Quintana, supra.* The evidence used to prove his guilt of participation in each crime of fraud was part and parcel of the same evidence that was used to prove his guilt in each crime of securities fraud. *See State v. Tanton, supra.* Stated simply, one cannot be guilty of securities fraud if, in connection with purchase, sale or offer of a security, he has not committed a *fraud* by any of the methods listed in § 58–13–39. The offense of securities fraud "necessarily involves" the offense of fraud. *See State v. Martinez,* 77 N.M. 745, 427 P.2d 260 (1967).

Defendant could properly be convicted of both fraud and securities fraud, *State v. Maes, supra,* but he could be punished for only one offense. *Quintana, Maes, supra.* As a result, the sentences for fraud, and the fines imposed thereon, must be vacated.

### C. Disparity of Sentences Imposed

As a final argument, defendant calls our attention to sentences imposed by other divisions of the Second Judicial District Court on defendants convicted of similar MFA-related offenses, and asks us to set aside the judgment in this case for the trial court's abuse of discretion and, consequently, denial of defendant's right to due process.

We allowed defendant to supplement the appellate record by filing the record of dispositions in ten other MFA cases. That record discloses that some defendants were fined and others required to "make restitution" (*see State v. Steele,* 100 N.M. 492, 672 P.2d 665 (Ct.App.1983), but that sentences of imprisonment for seven defendants were deferred, and wholly suspended for the remaining three. In his brief, defendant says

these dispositions (or most of them) were submitted for the trial judge's consideration prior to sentencing. We do not have a record before us of the sentencing proceedings, but the State does not dispute defendant's representation in that regard. *But see State v. Duran*, 91 N.M. 756, 581 P.2d 19 (1978), and *State v. Padilla*, 95 N.M. 86, 619 P.2d 190 (Ct.App.1980).

 Defendant relies on two Illinois cases to urge that we compare the imprisonment sentence he received with the deferred or totally suspended sentences imposed on the other defendants convicted of the same crimes. The authority for such an appellate review in Illinois stems from its S.Ct.Rule 615(b)(4), Ill.Rev.Stat. ch. 110A, ¶ 615(b)(4) (1979). New Mexico does not have a parallel rule; this court has no such authority. We have previously held that if a sentence imposed accords with the law regarding sentencing, it is not an abuse of discretion for the trial court to impose the lawful sentence allowed. *See State v. Augustus*, 97 N.M. 100, 637 P.2d 50 (Ct.App.1981), and cases therein cited. In the absence of abuse of discretion, the claim of due process violation also must fall. A lawful sentence of imprisonment is not excessive as a matter of law. *State v. Mabry*, 96 N.M. 317, 630 P.2d 269 (1981). It could hardly be excessive, then, if a portion of the time imposed is suspended, as was done here.

We cannot help observing, however, that the trial court will be required to vacate two convictions and five fines upon remand of this case. It may very well be the trial court's decision at that time to reconsider the conditions and nature of the sentences imposed, in view of the reduction of the number of convictions upon which fines and terms of sentences may operate, and the dispositions made by other judges in similar cases. That decision, too, is solely in the trial court's discretion, so long as it complies with the sentencing options authorized by law. *See State v. Hernandez*, 97 N.M. 28, 636 P.2d 299 (Ct.App.1981).

The matter is remanded to the trial court to vacate the convictions on Counts IV and XIII, and to vacate the fines and terms of incarceration imposed on Counts I, IV, X, XIII, and XVII, and to modify the judgment accordingly.

IT IS SO ORDERED.

LOPEZ and NEAL, JJ., concur.